IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CECIL TOWNSHIP MUNICIPAL AUTHORITY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| NORTH AMERICAN SPECIALTY SURETY ) | |
| COMPANY, ) | |
| Defendant/Third ) | |
| Party Plaintiff, ) | Civil Action No. 11-608 |
| ) | |
| vs. ) | |
| ) | |
| EDWARD T. SITARIK CONTRACTING, ) | |
| INC., BELLA ENTERPRISES, INC., ) | |
| EDWARD T. SITARIK and KARRIE A. ) | |
| SITARIK, ) | |
| ) | |
| Third-Party Defendants. ) | |

## MEMORANDUM OPINION

Pending before the Court are two motions by the Cecil Township Municipal Authority ("the Authority"), seeking to dismiss with prejudice certain counterclaims brought by North American Specialty Insurance Company[1] ("North American") (Doc. No. 7) and by Third Party Defendants Edward T. Sitarik Contracting, Inc., Bella Enterprises, Inc., Edward T. Sitarik,

---

[1] North American Specialty Insurance Company states that the caption of this matter misidentifies the indemnifying company as North American Specialty Surety Company. By separate Order of Court, the Clerk of Court is directed to amend the caption accordingly.

and Karrie A. Sitarik (Doc. No. 15.)  For the reasons discussed below, both Motions are granted.

## I.    BACKGROUND

### A.   Factual History[2]

On July 13, 2006, Plaintiff Cecil Township Municipal Authority awarded three publicly bid contracts ("the Contracts") to a local construction company, Edward T. Sitarik Contracting, Inc. ("Sitarik.")  The Contracts covered a major public works project referred to as the Millers Run Sanitary Sewer Project ("the Project"), and consisted of a Southeast Collector Contract, a Southwest Collector Contract, and an Interceptor Contract.  The Authority maintains that at all times, it performed its obligations under the Contracts and was never in default.

Under the terms of the Contracts, Sitarik was required to complete all three parts of the Project by September 17, 2007. When it failed to meet this deadline, it requested and was granted an extension until October 27, 2007, to complete the Southeast Collector Contract and until October 29, 2007, to complete the Interceptor Contract; the Contract for the Southwest Collector was not extended after the original deadline.  The work was not completed by those dates and, in

---

[2] The facts in this section are taken from the Complaint, Doc. No. 1, Exh. B.

fact, had not been completed as of April 14, 2008, when Sitarik proposed a new completion date of June 13, 2008.  The Authority rejected this new date and never agreed to any further extensions after the September/October 2007 dates.

Moreover, the Authority alleges, the work that had been completed by Sitarik failed to meet the plans and specifications set forth in the Contracts.  Briefly summarized, these problems included failing to:

install certain pipes on the line and grade specified;

complete trench excavation, backfill, and restoration;

replace improvements (e.g., walls, fences, and shrubbery) disturbed by the work performed;

properly clean and flush the sewer lines to remove debris upon completion of the Project;

install manholes properly, that is, failing to use the specified pipe inverts, anchor the manholes, ensure that manhole joints were watertight, and install steps or rungs as required;

properly test the lines upon completion and certifying to the Project engineer that the lines had passed the required tests when in fact three out of ten did not;

install lines between the manholes according to the specifications in the Contracts;

properly seal several trench joints; and

apply seal and slurry seal coats to certain surfaces.

(Complaint, ¶¶ 12-60.)

As required by the Contracts and by the Pennsylvania Public Works Contractors' Bond Law, 8 P.S. § 191 *et seq.,* Sitarik had

been required to post Performance Bonds ("the Bonds") in the amount of $7,352,693.45, that is, 100% of the three Contract prices. These Bonds were provided by North American, which by doing so, jointly and severally bound itself with Sitarik as an obligee for completion of the Project. According to the Authority, the Bonds provided that

> [i]n the event of a default by Sitarik, Defendant North American was bound to either remedy the default, complete the [Project] in accordance with the Contracts' terms and conditions, or obtain and award bids for the completion of the Project, arrange for a contract between the [Authority] and the bidder and make available as work progresse[d] sufficient to pay the cost of completion, less the balance of the Contracts' price in an amount not to exceed [$7,352,693.45.]

(Complaint, ¶ 64.)

According to the Authority, each of the construction deficiencies listed above, as well as the failure to complete the Project on time, was a material breach of the Contracts. On June 19, 2008, the Authority, acting pursuant to the Contracts, declared Sitarik in default. It timely notified North American of the default and requested that North American perform its obligations as set out in the Bonds. Despite repeated demands for performance, North American has neglected or refused to do so, thereby materially breaching the terms of the Bonds. As a result of North American's breach, the Authority has incurred or will incur monetary damages of at least $658,637.87 in an effort

4

to remedy the deficiencies in Sitarik's work and complete the Project.

B.   Procedural Background

The procedural history of this case is complicated somewhat by the fact that multiple counterclaims and a third-party complaint have been filed.   We summarize each of these, identifying them by the parties involved.

1.  *Complaint by the Authority against North American and North American's counterclaims:*  Plaintiff filed suit in the Court of Common Pleas of Washington County on April 19, 2011, and served North American on the same date.   On May 9, 2011, North American timely removed the case to this Court pursuant to 28 U.S.C. §§ 1441(a) and (b), based on complete diversity of the parties and an amount in controversy greater than the statutory minimum, as required by 28 U.S.C. § 1332.[3]   The Authority did not object to removal.

On May 9, 2011, North American filed its answer to the Complaint, incorporating several affirmative defenses and two counterclaims.    In   the   first   counterclaim   for   breach   of contract,   North   American   alleges   that   contrary   to   the Authority's allegation in the Complaint that it was never in

---

[3]   North American states, without objection from the Authority, that it is a corporation organized and existing under the laws of the state of New Hampshire with its principal place of business in Manchester, New Hampshire.   The Authority is a duly organized political subdivision of Washington County, Pennsylvania, with its offices located in Cecil, Pennsylvania.   (Notice of Removal, Doc. No. 1, ¶¶ 6-7.)

default of the Contracts, it had breached numerous obligations thereunder by failing to provide accurate information during the bidding process, adequate plans and specifications, accurate information during the prosecution of the work, proper inspections, and the required architectural and engineering support. (Doc. No. 4, Counterclaims, ¶ 3.) Moreover, despite having affirmed that the work under the Contracts was substantially complete in November and December 2007, the Authority failed or refused to release a total of $265,000 in contract balances and/or retainage. Pursuant to the terms of a General Indemnity Agreement dated October 6, 2003, between North American and Sitarik, Bella Enterprises, Inc., Edward T. Sitarik and Karrie A. Sitarik) ("the Indemnity Agreement" and, collectively, "the Indemnity Defendants"), the latter assigned all their rights under the Contracts to North American. North American is therefore entitled to recover from the Authority all sums due to Sitarik as a result of the Authority's breaches of the Contracts and consequential damages in the form of delays, increased costs of performing work under the Contracts, extended field and office overhead, and related costs. (Doc. No. 4, Counterclaims, ¶¶ 1-9.)

In Counterclaim II, North American alleges that by failing to pay the $265,000 in contract balances or retainage, despite having affirmed substantial completion of the work, the

6

Authority has violated the Pennsylvania Prompt Pay Act, 62 Pa. C.S. §§ 3931-3939 ("the PPA.") As a result of that violation, North American is entitled to interest on the unpaid contract balances and/or retainage as well as penalties, attorneys' fees, and costs as provided for in 62 Pa. C.S. § 3935. (Doc. No. 4, Counterclaims, ¶¶ 10-16.)

The Authority responded by filing the now-pending motion to dismiss with prejudice Counterclaim II, along with any requests for relief in Count I which might be attributed to the PPA, arguing that such claims are barred by the applicable statute of limitations.

2. *North American's third-party complaint against the Indemnity Defendants:* On May 23, 2011, North American filed a third-party complaint against the Indemnity Defendants. (Doc. No. 5, "Third-Party Complaint.") North American alleged that in the Indemnity Agreement, those parties had agreed to indemnify North American

> for any and all liability, loss, costs, damages, fees of attorneys and consultants and other expenses, including interest, which [North American] may sustain or incur by reason of, or in consequence of, the execution of any bonds issued on behalf of [Sitarik] including attorneys' fees and expenses incurred in enforcing the obligations of any of the Indemnity Defendants under the Indemnity Agreement.

(Third-Party Complaint, ¶ 5.)

In addition to the claim by the Authority for damages in the amount of $658,637.87 from Sitarik's alleged failure to timely complete the work required under the Contracts according to the specifications therein, North American also alleged that Mack Industries, Inc. ("Mack"), had filed a claim against the performance bonds and sued North American for some $271,266 due from Sitarik for services and/or materials Mack had provided in connection with the Project. Despite notice from North American, the Indemnity Defendants have failed to perform their obligations under the Indemnity Agreement.

In Count I of the Third-Party Complaint, North American alleges the Indemnity Defendants have breached the Indemnity Agreement and seeks a total of $929,904.28, together with costs and attorneys' fees incurred as a result of its efforts in this lawsuit and the litigation brought by Mack.

In Count II, North American alleges that despite its demands, the Indemnity Defendants have failed to comply with another provision of the Indemnity Agreement, namely, to post security in the event claims or demands were made against North American by reason of the issuance of the Bonds. North American seeks an Order of Court directing the Indemnity Defendants to post collateral in the amount of $929,904.28.

According to North American, "hold harmless" provisions such as that in the Indemnity Agreement quoted above have been

construed as giving rise to a right of contractual exoneration. In Count III, North American demands judgment against the Indemnity Defendants for all demands, liabilities, losses, costs, damages, attorneys' fees and expenses, both past and future, incurred as a consequence of it having issued the Bonds.

Finally, in Counts IV and V, North American alleges that it is entitled to common law indemnification and common law exoneration, respectively, from Sitarik for all demands, liabilities, losses, etc. arising by reason of or in consequence of having issued the Bonds.

On July 15, 2011, the Indemnity Defendants filed their answer to the Third-Party Complaint, stating a number of affirmative defenses. (Doc. No. 14.) They did not, however, move to dismiss any of North American's five claims.

3. *Indemnity Defendants' claims against the Authority:* In the same pleading as the answer and affirmative defenses to the Third-Party Complaint, Sitarik states two claims against the Authority. In Count I, Sitarik refers to the fact that by letter of January 2, 2008, the Authority's engineer affirmed that the three Contracts had been substantially completed on November 20, December 7, and December 20, 2007. However, in June 2009, Sitarik was informed it would not be allowed to complete its work under the Contracts despite its ability and willingness to do so. Sitarik therefore seeks the

9

unpaid contract balances and/or retainage in the amount of $265,000, plus consequential damages, for the Authority's breach of contract.

In Count II, Sitarik duplicates the claim raised by North American, i.e., by failing to pay the outstanding $265,000, the Authority has violated the Prompt Pay Act and Sitarik is therefore entitled to penalties, interest, attorneys' fees and costs pursuant to 62 Pa. C.S. § 3935.

On August 4, 2011, the Authority moved to dismiss the claims brought against it by Sitarik, arguing that the contractor did not have standing inasmuch as it had assigned all of its rights in the Contracts to North American. Alternatively, the claims should be dismissed as having been filed outside the statute of limitations period, that is, for the same reason North American's claims brought under the PPA should be dismissed. (Doc. No. 15.)

The parties having fully briefed their respective positions, both Motions are now ripe for consideration.

## II. JURISDICTION AND VENUE

As noted above, this Court has jurisdiction pursuant to 28 U.S.C. § 1332. Venue is appropriate in this District inasmuch as a substantial part of the events giving rise to the claims occurred in this District. 28 U.S.C. § 1391(a)(2).

## III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a) requires that a pleading which "states a claim for relief must contain. . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief."  The Rule further provides that "[e]ach allegation must be simple, concise, and direct" but "[n]o technical form is required."  Fed. R. Civ. P. 8(d).  "The touchstone of Rule 8(a)(2) is whether a complaint's statement of facts is adequate to suggest an entitlement to relief under the legal theory invoked and thereby put the defendant on notice of the nature of the plaintiff's claim."  In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 320, n.18 (3d Cir. 2010), citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 565, n.10 (2007).

In the aftermath of Twombly and Ashcroft v. Iqbal, ___ U.S. ___, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009), and the interpretation of those two cases by the United States Court of the Appeals for the Third Circuit in a series of precedential opinions, the pleading standards which allow a complaint to withstand a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) have taken on slightly new parameters.  See Phillips v. County of Allegheny, 515 F.3d 224 (3d Cir. 2008), McTernan v. City of York, 564 F.3d 636 (3d Cir. 2009), Fowler v. UPMC Shadyside, 578 F.3d 203 (3d Cir. 2009), Gelman v. State

Farm Mut. Auto. Ins. Co., 583 F.3d 187 (3d Cir. 2009), and Mayer
v. Belichick, 605 F.3d 223 (3d Cir. 2010).

Under the current formulation, in considering a motion to
dismiss under Rule 12(b)(6), the court must take three steps to
determine the sufficiency of the complaint: it must (1) note
"the elements a plaintiff must plead to state a claim;" (2)
identify allegations that "are no more than conclusions" and
thus "are not entitled to the assumption of truth," and (3)
assume the veracity of well-pleaded factual allegations and
determine if they "plausibly give rise to an entitlement for
relief." Santiago v. Warminster Twp., 629 F.3d, 121, 130 (3d
Cir. 2010), quoting Iqbal, 129 S.Ct. at 1947. A complaint may
not be dismissed merely because it appears unlikely that the
plaintiff can prove those facts or will ultimately prevail on
the merits. At this stage of the litigation, the Court must
determine if the plaintiff has sufficiently pled its claims, not
whether it can prove them. Culinary Serv. of Del. Valley v.
Borough of Yardley, No. 09-4182, 2010 U.S. App. LEXIS 13485, *10
(3d Cir. June 30, 2010), citing Fowler, 578 F.3d at 213.

If the Court determines that the complaint fails to satisfy
the pleading standards of Twombly and Iqbal, ordinarily the
plaintiff should be given an opportunity to amend its claims to
correct the identified deficiencies. Phillips, 515 F.3d at 236.
However, this opportunity need not be extended where amendment

would be inequitable or futile. *See,* e.g., <u>Harris v. City of Pittsburgh</u>, CA No. 11-46, 2011 U.S. Dist. LEXIS 133404, *20 (W.D. Pa. Nov. 18, 2011) (dismissing the plaintiff's punitive damages claim with prejudice inasmuch as it is well-established that a municipality is immune from such damages and amendment would therefore be futile); <u>Cange v. Markell</u>, CA No. 11-764, 2011 U.S. Dist. LEXIS 128347, *8 (D. Del. Nov. 7, 2011) (dismissing claims brought under 42 U.S.C. §§ 1983 and 1985 without leave to amend because the suit was barred by a two-year limitations period applied to such claims under Delaware law); and <u>Watford v. New Jersey</u>, CA No. 11-104, 2011 U.S. Dist. LEXIS 102872, *10 (D. N.J. Sept. 9, 2011) (dismissing with prejudice a suit in which the plaintiff appealed state court decisions regarding post-conviction relief because such claims were barred by the Rooker-Feldman doctrine and amendment would be futile.)

## IV.  DISCUSSION

### A.  <u>Motion to Dismiss North American's Counterclaims</u>

1.  *The parties' arguments:*  The Authority argues that Counterclaim II,[4] in which Defendant alleges it violated the Prompt Pay Act portion of the Pennsylvania Procurement Code,

---

[4]  In Counterclaim I, North American asserts it is entitled to recover all sums due to Sitarik as a result of the Authority's breaches "pursuant to the Contracts, **the Procurement Code,** and the Indemnity Agreement."  (Counterclaim I, ¶ 9, emphasis added.)  Since North American has not distinguished how the damages due under the Procurement Code in Counterclaim I differ from those described in Counterclaim II, the Court will focus on the latter.

13

must be dismissed because North American's claims were made more than a year after the statute of limitations period for bringing such a claim had expired.  Relying on 42 Pa. C.S. § 5524(5), Ash v. Cont'l Ins. Co., 932 A.2d 877, 885 (Pa. 2007), and Sikirica v. Nationwide Ins. Co., 416 F.3d 214, 225 (3d Cir. 2005), the Authority contends that North American's statutory claim for a penalty and attorneys' fees would be barred as an original action because of the statute of limitations and therefore may not be brought as a counterclaim.  (Plaintiff's Brief in Support of Its Motion to Dismiss, Doc. No. 8, at 5, *citing* Gumienik v. Lund, 314 F.Supp. 749, 751 (W.D. Pa. 1970.))  The Authority argues in the alternative that Counterclaim II must be dismissed because North American has, in effect, conceded in its answer to the Complaint that the Authority did not act in a vexatious and arbitrary manner by withholding $265,000 due to Sitarik and thus failed to state a claim for bad faith as required by § 3935. (Id. at 6-7.)

North American responds that the damages provided for in § 3395 are not, as the Authority claims, "civil penalties" because such damages are payable to the aggrieved contractor as opposed to a governmental entity and are remedial rather than penal in nature.  North American proposes that instead of finding a two-year limitations period applies, the Court should follow the reasoning of the Court of Common Pleas in Mastercraft

14

Woodworking Co. v. Jim Lagana Plumbing & Heating, Inc., 9 Pa. D. & C. 5th 251 (Berks County C.C.P. 2009), and hold that the Counterclaims are timely inasmuch as they were filed within the four-year statute of limitations period applying to contract actions under 42 Pa. C.S. § 5525. (Brief of Defendant. . .in Opposition to Motion to Dismiss, Doc. No. 10, at 3-4.) Moreover, North American denies it has conceded that the Authority did not act in bad faith when it withheld the final contract balances and/or retainage. (Id. at 5-6.)

2. *Applicable law:* We begin with a review of the statute on which Counterclaim II is based, limiting our discussion to the factors which are relevant herein. Title 62 of the Pennsylvania Code states the law pertaining to procurement of public works by Commonwealth "agencies," a term which includes municipal authorities such as Plaintiff. Chapter 39 of the Procurement Code, pertaining to contracts for public works, addresses such matters as preliminary provisions, general provisions, prompt payment schedules, and substantial/final payment provisions. 62 Pa. C.S. §§ 3901-3942.

The portion of Chapter 39 known as the Prompt Pay Act, Subchapter D, sets out the provisions requiring payments by the Commonwealth agency to the contractor and the contractor to its subcontractors. "The purpose of the Act is to ensure prompt payment of contractors by government agencies and, in turn,

15

subcontractors by contractors for work performed in accordance with the provisions of a contract for a public work." Structural Group, Inc. v. Liberty Mut. Ins. Co., CA No. 07-1793, 2009 U.S. Dist. LEXIS 18587, *6 (M.D. Pa. Mar. 5, 2009). In general, the statute requires the agency to make progress and final payments to its contractors[5] "strictly in accordance with the contract" (§ 3932) and provides for interest when such payments are not timely made. The PPA further provides that the government agency may withhold payment for deficiency items, again consistent with the terms of the contract, but must notify the contractor of what those deficiencies are within the period specified by the contract or within 15 days after the application for payment is made. Id., § 3934.

The portion of the Prompt Pay Act in question here is § 3935 entitled "Penalty and Attorney Fees." Omitting those portions not relevant herein, this section provides:

> (a) Penalty. — If. . .a claim with. . .a court of competent jurisdiction is commenced to recover payment due under this subchapter and it is determined that the government agency. . .has failed to comply with the payment terms of this subchapter,. . .the court may award, in addition to all other damages due, a penalty equal to 1% per month of the amount that was withheld in bad faith. An amount shall be deemed to have been withheld in bad faith to the extent that the withholding was arbitrary or vexatious. An amount shall not be deemed to have been withheld in bad faith to the extent it was withheld pursuant to section 3934

---

[5]   Parallel provisions for contractors paying subcontractors also apply, but have been omitted from the remainder of this discussion.

16

(relating to withholding of payment for good faith claims).

(b) Attorney Fees.-- Notwithstanding any agreement to the contrary, the prevailing party in any proceeding to recover any payment under this subchapter may be awarded a reasonable attorney fee in an amount to be determined by the. . .court. . ., together with expenses, if it is determined that the government agency. . .acted in bad faith. An amount shall be deemed to have been withheld in bad faith to the extent that the withholding was arbitrary or vexatious.[6]

62 Pa. C.S. § 3935.

The parties' arguments focus on the length of the period in which a claim under § 3395 must be brought.  While application of the statute of limitations is usually an affirmative defense, it may be proper grounds for dismissal under Rule 12(b)(6).  "If the allegations. . .show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim."  *See* Jones v. Bock, 549 U.S. 199, 215 (2007), *citing*, *inter alia*, Leveto v. Lapina, 258 F.3d 156,

---

[6]  The terms "arbitrary" and "vexatious" are not defined in the Prompt Pay Act or elsewhere in the Procurement Code.  "Absent a definition in a statute, statutes are presumed to employ words in their popular and plain everyday sense, and popular meanings of such words must prevail."  Cummins v. Atlas R.R. Const. Co., 814 A.2d 742, 747 (Pa. Super. Ct. 2006) (internal quotation omitted.)  In the context of the Prompt Pay Act, "arbitrary" has been held to mean "based on random or convenient selection or choice rather than on reason or nature," and "vexatious" defined as "a legal strategy without sufficient ground in either law or in fact and serving the sole purpose of causing annoyance."  Pietrini Corp. v. Agate Constr. Co., 901 A.2d 1050, 1053 (Pa. Super. Ct. 2006) (internal quotations and alterations omitted); *see also* Thunberg v. Strause, 682 A.2d 295, 299 (Pa. 1996) (using the same definitions.) Because we dismiss Counterclaim II as untimely, we need not reach Plaintiff's second argument that North American has conceded that the Authority's actions were neither arbitrary nor vexatious.

17

161 (3d Cir. 2001) ("a complaint may be subject to dismissal under Rule 12(b)(6) when an affirmative defense. . .appears on its face"); *see also* Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 n.1 (3d Cir. 1994), stating that "[w]hile the language of Fed. R. Civ. P. 8(c) indicates that a statute of limitations defense cannot be used in the context of a Rule 12(b)(6) motion to dismiss, an exception is made where the complaint facially shows noncompliance with the limitations period and the affirmative defense clearly appears on the face of the pleading."

Title 62 does not state the period of time in which a claim thereunder must be brought. As noted above, the Authority contends that claims brought under the Prompt Pay Act are subject to the two-year limitations period for bringing certain actions commonly thought of as tortious, because a claimant is invoking an "action upon a statute for a civil penalty or forfeiture." 42 Pa. C.S. § 5524(5). Conversely, North American argues that the four-year period applicable to actions based in contract should be applied. If the Authority's reasoning is correct and a two-year statute of limitations period applies, Counterclaim II and, to the extent it invokes the PPA, Counterclaim I, must be dismissed as untimely.

3. *Discussion and conclusion:* The Court concludes that the Authority has the better argument on the limitations

18

period to be applied to a claim brought pursuant to § 3395 and that North American's claims are time-barred. In arriving at this conclusion, we have enjoyed almost no direction from either the Pennsylvania courts or the federal courts applying Pennsylvania law. Somewhat surprisingly, in the period since 1998 when the prompt pay provisions were enacted, only two Pennsylvania courts have addressed the statute of limitations question and they have reached conflicting decisions. *Compare* Colonial Sur. Co. v. Warminster Twp., No. 2006-09619-19, 2008 Pa. Dist. & Cnty. Dec. LEXIS 304 (Bucks C.C.P. 2008) (applying a two-year statute of limitations), with Mastercraft Woodworking Company, Inc., v. Jim Lagana Plumbing & Heating, Inc., *supra* (finding that a four-year period applied.)[7]

As is well-established, "[w]hen the highest court of a state has not addressed an issue of law, a federal court sitting in diversity must predict how that court would decide the issue were it confronted with the problem." Nelson v. State Farm Mut. Auto. Ins. Co., 988 F.Supp. 527, 528-529 (E.D. Pa. 1997), *citing* Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938), and Packard v. Provident Nat. Bank, 994 F.2d 1039, 1046 (3d Cir. 1993). In arriving at that prediction, the federal court may look to intermediate appellate court opinions as "indicia" of the

---

[7] Since Colonial Surety and Mastercraft were handed down in 2008 and 2009, no opinion published on LEXIS has cited to them for any reason.

highest court's likely decision.  McNasby v. Crown Cork & Seal Co., Inc., 888 F.2d 270, 281 (3d Cir. 1989).  The federal court may also look to "relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand."  Nelson, id. at 529, *quoting* Packard, 994 F.2d at 1046; *see also* McKenna v. Ortho Pharm. Corp., 622 F.2d 657, 661-662 (3d Cir. 1980) (where there is no decision by the state's highest court on the "precise question at issue in a particular setting," the court must "isolate those factors that would inform its decision," including analogous cases that provide "useful indications of the court's probable disposition of a particular question of law.")  This Court is not bound, however, by the decisions of either the Colonial Surety or the Mastercraft court. *See* Structural Group, Inc., 2009 U.S. Dist. LEXIS 18587 at *9 ("With regard to the decisions of Pennsylvania's lower courts, the decision of a trial court in one Pennsylvania county is no more binding upon a trial court of another county than it is upon the Supreme Court of Pennsylvania--which is to say, not at all"); *see also* Packard, 994 F.2d at 1047, noting, however, that the federal court may consider lower state court decisions to be "more predictive" of the highest court's decision on a point of state law than conflicting federal court opinions.

If a statute does not provide a limitations period and the Pennsylvania Supreme Court has not ruled on the question, other courts will generally apply "the most closely analogous limitations period." Woody v. State Farm Fire and Cas. Co., 965 F.Supp. 691, 693 (E.D. Pa. 1997) (o'ruled by Ash, *supra*.)

Our conclusion that a two-year statute of limitations should apply to claims which seek remedies under § 3395 is based on (1) review of what we consider to be the most closely analogous statutory interpretation by the Pennsylvania Supreme Court; (2) review of the Colonial Surety and Mastercraft decisions; (3) consideration of the term "bad faith" and how it applies in contract and tort law; and (4) the language of the statute itself, i.e., the reference to "a penalty" where the government agency has acted in bad faith. We begin by setting the stage for the Supreme Court's analysis of the statute of limitations question in Ash v. Cont'l Ins. Co., 932 A.2d 877 (Pa. 2007).

In 1981, the Pennsylvania Supreme Court declined to create an independent common law cause of action for insurance policy holders whose claims had been denied by the insurer for no reason other than what the insureds saw as bad faith. *See* D'Ambrosio v. Pennsylvania Nat'l Mut. Casualty Ins. Co., 431 A.2d 966 (Pa. 1981). There, the Court stated instead that "[a]lthough the seriousness of 'bad faith' conduct by insurance

21

carriers cannot go unrecognized, our Legislature has already made dramatic, sweeping efforts to curb the bad faith conduct" by enacting the Unfair Insurance Practices Act, 40 P.S. §§ 1171.1 et seq. ("UIPA"), which identified some fifteen "unfair or deceptive acts or practices."  Id. at 969.   The Court recognized that the UIPA can only be enforced by the State Insurance Commissioner and not by private action, but declined to supplement the statutory sanctions by judicially creating a separate cause of action, concluding instead that it was up to the Pennsylvania Legislature "to determine whether sanctions beyond those created under the [UIPA] are required to deter conduct which is less than scrupulous." Id. at 970.

In response to the decision in D'Ambrosio, the Pennsylvania legislature, in 1990, enacted what is referred to as the "insurance bad faith statute," 42 Pa. C.S. § 8371, which provides:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>
> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
>
> (2) Award punitive damages against the insurer.
>
> (3) Assess court costs and attorney fees against the insurer.

42 Pa. C.S. § 8371.  Actions on insurance policies.

In what has been described as "an unfortunate omission which has caused considerable confusion," the insurance bad faith statute does not establish the limitations period in which claims thereunder must be brought. *See* Haugh v. Allstate Ins. Co., 322 F.3d 227, 233 (3d Cir. 2003). Between 1990 and 2007, Pennsylvania state courts and federal courts addressing this question arrived at different conclusions, some applying the two-year period applicable to tort actions set out in 42 Pa. C.S. § 5524 (*see*, e.g., Nelson, *supra,* and Liberty Mut. Fire Ins. Co. v. Corry Indus., No. 97-172, 2000 U.S. Dist. LEXIS 11735, *14 (W.D. Pa. Mar. 30, 2000)), while others applied the six-year "catch-all" period of 42 Pa. C.S. § 5527 (e.g., Woody, *supra*, and Miller v. Cincinnati Ins. Co., CA No. 08-1223, 1997 U.S. Dist. LEXIS 23725, *1 (E.D. Pa. July 8, 1997).)

The issue finally came before the Pennsylvania Supreme Court after Continental Insurance Company denied coverage on November 21, 2000, for fire damage to real property owned by Brent and Kathy Ash. On May 3, 2002, the Ashes filed a complaint for breach of contract; Continental asserted their claim was barred by the policy's one-year statute of limitations period. On June 23, 2003, the plaintiffs filed a motion for leave to amend their complaint to include a bad faith claim under § 8371. Continental opposed the motion, arguing such a

23

claim was untimely since it was subject to the two-year statute of limitations applicable to tort-like actions. *See* 42 Pa. C.S. § 5524(7). Despite the plaintiffs' argument that the claim was a hybrid tort-contract action and therefore subject to the six-year "catch-all" period of § 5527(b), the trial court granted Continental's motion for summary judgment as to the breach of contract claim and denied as futile the plaintiffs' motion to amend the complaint, having determined that as a "statutorily created tort action," the bad faith claim did, in fact, have to be brought within two years of the date on which coverage was denied. The Superior Court agreed with this decision and the case was appealed to the Pennsylvania Supreme Court on this basis. Ash, 932 A.2d at 878.

The Supreme Court agreed with the lower courts. It first noted that the Pennsylvania Judicial Code, which establishes limitations periods for civil actions in general, identifies a number of tort claims subject to the two year-statute of limitations period.[8] Contract and similar claims are subject to

---

[8] "The following actions are subject to a two-year limitations period: (1) An action for assault, battery, false imprisonment, false arrest, malicious prosecution or malicious abuse of process. (2) An action to recover damages for injuries to the person or for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another. (3) An action for taking, detaining or injuring personal property, including actions for specific recovery thereof. (4) An action for waste or trespass of real property. (5) An action upon a statute for a civil penalty or forfeiture. (6) An action against any officer of any government unit for the nonpayment of money or the nondelivery of property collected upon on execution or

24

a four-year statute of limitations,[9] a few civil actions are exempt from any limitations period (42 Pa. C.S. § 5531), and a "catch-all" period applies to any civil action not specifically assigned to one of the enumerated periods (id., § 5527(b).[10] Ash, 932 A.2d at 879-880.

As had the Superior Court in its discussion of the subject, the Supreme Court recognized that since 1990 when the bad faith statute was enacted, Pennsylvania and federal courts had been divided on the question of the period in which such a claim

---

otherwise in his possession. (7) Any other action or proceeding to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct or any other action or proceeding sounding in trespass, including deceit or fraud, except an action or proceeding subject to another limitation specified in this subchapter." 42 Pa. C.S. § 5524.

[9] "The following types of actions are subject to a four-year statute of limitations: (1) An action upon a contract, under seal or otherwise, for the sale, construction or furnishing of tangible personal property or fixtures. (2) Any action subject to 13 Pa. C.S. § 2725 (relating to statute of limitations in contracts for sale). (3) An action upon an express contract not founded upon an instrument in writing. (4) An action upon a contract implied in law, except an action subject to another limitation specified in this subchapter. (5) An action upon a judgment or decree of any court of the United States or of any state. (6) An action upon any official bond of a public official, officer or employee. (7) An action upon a negotiable or nonnegotiable bond, note or other similar instrument in writing. Where such an instrument is payable upon demand, the time within which an action on it must be commenced shall be computed from the later of either demand or any payment of principal of or interest on the instrument. (8) An action upon a contract, obligation or liability founded upon a writing not specified in paragraph (7), under seal or otherwise, except an action subject to another limitation specified in this subchapter." 42 Pa. C.S. § 5525.

[10] Section 5527(b) states: "Other civil action or proceeding. -- Any civil action or proceeding which is neither subject to another limitation specified in this subchapter nor excluded from the application of a period of limitation by section 5531 (relating to no limitation) must be commenced within six years." 42 Pa. C.S. § 5527.

could be brought. *See* Ash, 932 A.2d at 880-881, citing cases. The Court quoted with approval, however, several points raised by Court of Appeals in Haugh, which concluded that the Pennsylvania Supreme Court would find a § 8371 claim sounds primarily in tort because:

> courts have historically treated bad faith actions as torts;
>
> a bad faith action is based on tort-like standards of care;
>
> the greater number of the most recent decisions from Pennsylvania courts have treated a § 8371 claim as separate and distinct from the underlying contract action against the insurer;
>
> the majority of states recognizing a bad faith cause of action characterize it as a tort;
>
> courts have a duty to construe § 8371 to prevent an absurd result and it is unlikely the legislature intended to provide a six-year limitations period for a § 8371 claim--which sounds in tort and contract-- when the limitations periods for each of those claims are generally two and four years; [and]. . . .
>
> under Pennsylvania law, punitive damages are typically only awarded in tort actions.

Ash, 932 A.2d at 880-881, *citing* Haugh, 322 F.3d at 235-236 (other citations omitted.)

The Court then considered each of the plaintiffs' arguments for the six-year statute of limitations period. It first rejected the argument that the bad faith statute should be construed *in pari materia* with the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-1 *et seq.*, and

thus would be subject to six-year statute of limitations set out in § 5527(b). Ash, id. at 881-882. The Court pointed out that unlike the UTPCPL which covered a wide range of deceptive acts or trade practices, the bad faith insurance statute was concerned only with "the duty of good faith and fair dealing in the parties' contract and the manner by which an insurer discharge[s] its obligation[s.]" Id. at 882, quoting Toy v. Metropolitan Life Ins. Co., 928 A.2d 186, 199 (Pa. 2007). Moreover, unlike the UTPCPL which was to be liberally construed in order to protect Pennsylvania consumers from fraud and deceptive business practices in general, the bad faith statute applies only where the insured has filed "an action arising under an insurance policy" against his insurer, i.e., it applies only to narrow classes of plaintiffs and defendants.

Next, the Court considered the Ashes' argument that an action brought under § 8371 is more like a contract action than a tort action, despite the availability of punitive damages, because the statute clearly states that such an action "aris[es] under an insurance policy," thereby invoking contract principles. The plaintiffs also argued that the purpose of the law of torts, i.e., to "put an injured person in a position as near as possible to his position prior to the tort," was distinct from the punitive objective of § 8371. Moreover, if the Legislature had intended to create a statutory tort when it

27

enacted § 8371, it would have done so expressly. Rejecting all these arguments, the Court concluded that § 8371 is, in fact, a statutorily-created tort, and agreed with the lower courts that the Pennsylvania legislature had done precisely what the D'Ambrosio court had suggested, i.e., statutorily recognize a tort cause of action for bad faith in the insurance context. Ash, id. at 882-883.

Finally, the Supreme Court noted that Pennsylvania courts have identified a key difference between tort actions and contract actions: tort actions result from "breaches of duties imposed by law as a matter of social policy," while contract actions arise from "breaches of duties imposed by mutual consensus agreements between particular individuals." Ash, 932 A.2d at 884 (internal quotation omitted.) The Court concluded that in enacting § 8371, the Legislature had apparently determined that the other protections afforded to insurance policyholders by the UIPA were "insufficient to curtail certain bad faith acts by insurers and that it was in the public interest to enact § 8371 as an additional protection." Ash, id. at 885. Because the duty under § 8371 is imposed by law as a matter of social policy, rather than one agreed upon by mutual consensus, an action to recover damages for a breach of that duty derives primarily from the law of torts. Consequently, as

a tort action, claims under § 8371 are subject to the two-year statute of limitations of 42 Pa. C.S. § 5524. Ash, id.

We turn to the question of whether the reasoning of Ash is equally applicable to the statute of limitations issue with regard to the Prompt Pay Act. As noted above, there appear to be only two reported cases addressing this issue. Plaintiff relies on Colonial Surety, where the primary issue focused on the rights of Colonial as the surety who had paid bond claims for a number of subcontractors after the prime contractor ceased work on an uncompleted road project in Warminster Township. Colonial Surety, 2008 Pa. Dist. & Cnty. Dec. LEXIS 304, *1-*2. Along with several claims for breach of contract, unjust enrichment, breach of fiduciary duty and equitable lien (all of which were held by the court to be subject to a four-year statute of limitations), the surety company also claimed that the Township had violated of the Pennsylvania Procurement Code. After addressing the question of when the statute of limitations had begun to run on the claims brought by Colonial, the court stated -- without further analysis or discussion -- that "[t]he statute of limitations for claims alleging violation of the Pennsylvania Procurement Code is two years." Id. at *7, citing 42 Pa. C.S. § 5524.[11]

---

[11] We note that this decision was affirmed without opinion and further appeal was denied by the Pennsylvania Supreme Court. See,

Mastercraft Woodworking Company, Inc. v. Jim Lagana Plumbing & Heating, Inc., the case relied upon by North American, is more on point and provides a more detailed analysis. There, subcontractor Mastercraft sued Lagana for failing to pay for work Mastercraft had performed in connection with the renovation of two public schools. Laguna argued that Mastercraft's claim should be dismissed because it was brought under § 3395 and thus subject to the two-year statute of limitations of 42 Pa. C.S. § 5524(7), rather than the four-year period for contract claims. The court agreed and dismissed the bad faith claim. In arriving at this conclusion, it made several points, many of which rested on its reading of Ash:

> The bad faith provision of the PPA appears to be modeled on a similar, but not identical, provision of the Contractor and Subcontractor Payment Act,[12] 73 Pa. C.S. § 512, which mandates a non-discretionary penalty of 1% per month for payments wrongfully withheld and states that attorneys' fees "shall be" awarded to the prevailing party; by comparison, the court is given

---

respectively, 984 A.2d 1005 (Pa. Super. Ct. 2009), and 991 A.2d 309 (Pa. 2010). This fact, however, is of little importance. See Burgoon v. Zoning Hearing Bd., 277 A.2d 837, 841 (Pa. Commw. Ct. 1971), quoting Kramer v. Guarantee Trust & Safe Deposit Co., 33 A. 1047, 1048 (Pa. 1896), for the principle that "the allowance or refusal of the appeal must not be taken as an indication of any opinion on the merits of the decision or the correctness of the application of legal principles in the particular case."

[12] The Contractor and Subcontractor Payment Act, 73 P.S. § 501 et seq., applies generally to all construction contracts in the Commonwealth. The Mastercraft court concluded that because the contract in question pertained to work done on two public schools and involved a government agency, the more specific provisions of the Pennsylvania Public Works Procurement Code, 62 Pa. C.S. § 3901 et seq., should apply. Mastercraft, 9 Pa. D. & C. at 256-260.

only discretionary power to award the same penalties under § 3395. Mastercraft, 9 Pa. D. & C. 5th at 260.

A bad faith action under § 8371 is not related to nor does it depend on the underlying contract claim. Rather, it is recognized as distinct, unlike a claim under § 3395 which requires an initial finding that the government agency breached the underlying contract before bad faith can be found. Mastercraft, id. at 264-265.

Section 8371 does not limit the amount of punitive damages, while the PPA limits the penalty to 1% per month plus attorneys' fees, a distinction the court perceived as a legislative intent to provide additional compensation in the nature of recoupment of attorneys' fees expended as the result of being forced to litigate the matter and the loss of the use of funds rather than a form of punishment. Id. at 265.

Section 3395 "focuses on redress to an aggrieved party, not the furtherance of social policy by providing a deterrent to entities with financial or positional advantage from engaging in improper conduct or delays." Id. at 265.

In sum, the Mastercraft court concluded, the penalty and attorneys' fees provision of § 3395 "does not provide a separate claim under tort, but allows additional damages on a contractual claim initiated under its provisions," and thus the four-year statute of limitations under 42 Pa. C.S. § 5525 applied. Mastercraft, 9 Pa. D. & C. 5th at 265.

We disagree with the reasoning of the Mastercraft court and believe the Pennsylvania Supreme Court would find that a bad faith claim brought under § 3395 is subject to a two-year statute of limitations period. We offer the following reasons for this conclusion, again limiting our discussion to the

31

context of a dispute between a government agency and a contractor rather than between a contractor and a subcontractor.

• Section 3395 may be invoked only for one type of specific action – withholding payments otherwise due to a contractor by a government agency – and only when there is a finding that the withholding was done in bad faith. Claims of bad faith, whether in the insurance context or in general, have historically been treated as torts, to which, under Pennsylvania law, a two-year limitations period applies. *See* Haugh, 322 F.3d at 234-235, and n. 13, discussing cases.

• Sections 8371 and 3395 have more characteristics in common than acknowledged by the court in Mastercraft. First, both statutes apply only in very narrow circumstances. As the Court pointed out in Ash, § 8731 applies only to actions between insurers and insureds where the parties are bound by contract; the same applies in the case of § 3395, where the only litigants are contractors on public works paid for by government agencies. Second, unlike a bad faith claim arising in a routine breach of contract case where either party can claim the other has acted in bad faith, the statutory bad faith claim can only be brought against the insurer or the government agency. Third, contrary to the reasoning in Mastercraft, nothing prevents a litigant from proceeding simultaneously with both a bad faith breach of contract claim and a bad faith tort claim under § 8371. *See*

Ash, 932 A.2d at 883-884 and n. 2, discussing the distinction between the contractual duty of good faith and the duty imposed by statute.    In fact, unless barred by the gist of the action doctrine,[13] such a practice is fairly common, despite the differences in the statute of limitations periods for the contract and tort claims.    We see no reason a contractor could not similarly proceed with a bad faith breach of contract claim and a claim for damages under § 3395, regardless of differing limitations periods. Fourth, contrary to the Mastercraft view that a bad faith action under § 8371 is not related to and does not depend on the underlying contract claim, the Third Circuit Court of Appeals in Polselli v. Nationwide Mut. Fire Ins. Co., 126 F.3d 524, 531 (3d Cir. 1997), has pointed out that "while a section 8371 bad faith claim itself is created by statute, the claim has its genesis in the policy of insurance."    The Polselli Court also acknowledged that a bad faith claim "depends on the

---

[13]  See Hill v. Best Med. Int'l, Inc., CA No. 07-1709 et al., 2011 U.S. Dist. LEXIS 123845, *98-*100 and n.34 (W.D. Pa. Oct. 25, 2011), where this Court summarized the gist of the action doctrine. Briefly stated, it is a common law theory "designed to maintain the conceptual distinction between breach of contract claims and tort claims" by precluding plaintiffs from "recasting ordinary breach of contract claims into tort claims."    eToll, Inc. v. Elias/Savion Adver., 811 A.2d 10, 14 (Pa. Super. Ct. 2002) (internal citation omitted). The doctrine bars tort claims: (1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract. Hart v. Arnold, 884 A.2d 316, 340 (Pa. Super. Ct. 2005) (citations omitted).

existence of a predicate contract cause of action" and the statute allows a plaintiff to "enforce an insurer's implicit contractual duty of good faith." Id. at 530. We conclude a similar contract-based but independent cause of action was contemplated by the Legislature when enacting § 3395.

• A finding of bad faith under § 3395 raises the possibility that the contractor may be awarded 1% per month interest on the amount withheld in bad faith. This is in addition to the "ordinary" interest to which it is entitled if progress and final payments are not made in a timely manner. See 62 Pa. C.S. §§ 3932(c) and 3941(b). Such an additional award could be construed as a means of punishment or deterrence because it is twice the statutorily mandated interest usually available under Pennsylvania law. See 41 P.S. § 202, stating that reference to the "legal rate of interest," unless otherwise specified in the document or law in question, "shall be construed to refer to the rate of interest of six per cent per annum." Moreover, it is far in excess of current rates for commercial borrowing, and as such, an award at that rate would be more than a simple recoupment by the contractor for the time value of money.

• Both § 8371 and § 3395 contemplate discretionary action by the court after finding bad faith. Section 8371 states that if the court finds that the insurer has acted in bad

34

faith, it "may" take certain actions; Section 3395 states that if the court finds that the government agency failed to comply with the payment terms of the statute, it "may award, in addition to all other damages due, a penalty equal to 1% per month of the amount that was withheld in bad faith."

•   As stated in Ash, the duty of good faith codified in § 8371 was "imposed by law as a matter of social policy." Ash, 932 A.2d at 885. The Pennsylvania Superior Court has indicated that "the clear intent of the Prompt Pay Act is to level the playing field between contractors and subcontractors when they are working on public projects." Pietrini Corp. v. Agate Constr. Co., 901 A.2d 1050, 1055 (Pa. Super. Ct. 2006). This statement implies that the Superior Court recognized a legislative intent to provide more than a simple legal remedy for breach of contract. To the contrary, by enacting § 3395, the Legislature could be seen as promoting a public policy goal parallel to that of § 8371 -- deterring the larger entity that controls the purse strings – the insurance company or government agency – from using its economic power to coerce or manipulate "the little guy." See Pietrini Corp., id. at 1054 (the penalty provision of the PPA was intended to negate "harsh negotiating tactics" verging on coercion by compelling the government to act in good faith with its contractors.)

We also reject North American's argument that the sanctions provided by § 3395 do not constitute a "civil penalty or fine" because the monies are not paid to the public fisc but rather to the aggrieved litigant. (Doc. No. 10 at 4 and n. 3.) "As used in 42 Pa. Cons. Stat. Ann. § 5524(5), an 'action upon a statute for a civil penalty or forfeiture' encompasses statutory civil actions that are penal, deterrent, punitive, and non-compensatory in nature." Cohen v. Zarwin & Baum, P.C., CA No. 93-2145, 1993 U.S. Dist. LEXIS 18055, *6-*7 (E.D. Pa. Dec. 22, 1993), concluding that because 29 U.S.C. § 1132(a)(1)(A) provided a monetary penalty when the administrator of an ERISA-covered plan failed to comply with a participant's request for information, in the absence of a statute of limitations period for such breach of fiduciary duty claims in ERISA itself, § 5524(5) should be applied. Other Pennsylvania courts have allowed recovery under this same "civil penalty" provision where the fine or other monetary payment is made not to a government entity but to the injured party. For instance, in Ortlieb v. Hudson Bank, 312 F. Supp.2d 705, 716 (E.D. Pa. 2004), the court held that the defendants were subject to the penalties of 21 P.S. § 682 after they failed to enter satisfaction on mortgages for the plaintiff's real property within 45 days of his payment of the outstanding amount and his request that the mortgages be so marked. The penalty for that failure under the statute is a

36

fine in an amount not exceeding the amount of the mortgage, payable to "the party or parties aggrieved." The court concluded that Ortlieb's claims were barred by the statute of limitations in 42 Pa. C.S. § 5524(5) because they were based on requests to satisfy made more than two years before he filed suit. Id. See also Estate of Ortlieb v. Hudson United Bank, Nos. 04-2024 and 04-2261, 2005 U.S. App. LEXIS 5175, *7 (3d Cir. Mar. 30, 2005), affirming the district court, including the application of § 5524(5).

Finally and most obviously, the argument that the Legislature did not intend to make the damages available under § 3395 a "penalty" ignores the caption of the provision, which uses that exact word. The Pennsylvania Supreme Court has directed that in interpreting a statute, the role of the court is to "give effect to the intent of the Legislature." Pantuso Motors, Inc. v. CoreStates Bank, N.A., 798 A.2d 1277, 1282 (Pa. 2002). "In ascertaining such intent, section headings and titles may be used as an aid" and "words and phrases must be understood according to their common usage." Id. The Court in Pantuso noted that "a penalty. . . is fixed, not as a pre-estimate of probably actual damages, but as a punishment, the threat of which is designed to prevent the breach." Id. Given the explicit use of the word "penalty" (as opposed to "damages" or "remedy," for instance), and the fact that it is fixed in the

37

statute as "equal to 1% per month of the amount that was withheld in bad faith," we believe it would be contrary to the intent of the Legislature to view § 3395 as anything other than a civil penalty.

Therefore, we find that the limitations period in which a claim under 62 Pa. C.S. § 3395 must be brought is two years. According to North American's own allegations, the bad faith claim accrued in 2008,[14] when the Authority advised Sitarik that its work on the Project was substantially complete, but continued to withhold the contract balances and retainage. (Doc. No. 4, ¶¶ 5-6, 11-12.) Because the Counterclaim for violation of the Prompt Pay Act was not filed until May 11, 2011, it is barred by the two-year statute of limitations we believe the Pennsylvania Supreme Court would apply and will therefore be dismissed with prejudice.

B.  Motion to Dismiss the Indemnity Defendants' Claims

1.  *The parties' arguments:*  Plaintiff's first argument regarding Count II of Sitarik's complaint is identical

---

[14] According to the Counterclaims, the Authority advised Sitarik that its work on the Project was substantially complete by letter dated January 2, 2008. North American was advised of Sitarik's default in June 2008. The Contract provisions regarding the date by which the contract balances and retainage were to be paid following substantial completion are not in evidence. However, there is no evidence to show that the claim accrued **only after** May 11, 2009, the first day of the two-year period prior to the date on which the Counterclaims were filed. If such evidence existed, North American surely would have pointed to it as another means to defeat the Authority's argument that the claim was untimely under a two-year statute of limitations period.

to the argument applied to Counterclaim II by North American, that is, the claim is subject to a two-year statute of limitations and therefore untimely.   For the reasons discussed at length above, Sitarik's claim for interest, penalties, attorneys' fees, and other relief stemming from the Authority's purported violation of the PPA is dismissed with prejudice.

As noted above, Sitarik also seeks damages for breach of contract by the Authority for such things as failing to provide accurate information during the bidding process and the prosecution of the work, as well as breaching its obligation to provide adequate plans, specifications, and architectural and engineering support.   The Authority argues that this claim must be dismissed because Sitarik assigned all of its rights under the Indemnity Agreement to North American, the latter is the real party in interest and Sitarik lacks standing to bring this action. Specifically, Sitarik assigned its rights to the balance of the contract payments and retainage to North American in Paragraph 5 of the Indemnity Agreement which states that Sitarik and the other Indemnity Defendants are assigning "all of their rights under the contracts referred to in such bonds, including. . . (c) any and all sums due or which may thereafter become due under such contracts."   (Doc. No. 16 at 7-8.)

In response, Sitarik argues that although it and the other Indemnity Defendants assigned all of their interest in the

contracts to North American, it did so only under certain
conditions, none of which has not yet occurred. Specifically,
the Indemnity Agreement provides:

> The [Indemnity Defendants] hereby assign, transfer,
> pledge and convey to [North American] (effective as of
> the date of each such bond, but only in the event of
> default, breach or failure as referred to in preceding
> Section 4(c)), as collateral security, to secure the
> obligations hereunder and any other indebtedness and
> liabilities of the [Indemnity Defendants] to [North
> American], all of their rights under the contracts
> referred to in such bonds, including their right,
> title and interest in and to . . . (c) any and all
> sums due or which may be thereafter become due under
> such contracts, and all sums due or to become due on
> all other contracts, bonded or unbonded, in which any
> or all of the [Indemnity Defendants] have an interest.

(Brief in Opposition to Motion to Dismiss, Doc. No. 18, "Sitarik
Brief," at 3; *see also* Doc. No. 14, Exh. A, Indemnity Agreement,
¶ 5.)

> Paragraph 4(c) of the Indemnity Agreement in turn provides:

> If any such bond be given in connection with a
> contract, [North American] in its sole discretion is
> hereby authorized but not required. . . (c) in the
> event of any breach or default in the performance of
> the contract, or the breach of this Agreement or of
> any bond connected therewith, or the failure to
> diligently prosecute the work under the contract. . .
> . , to take possession of the work under the contract
> and, at the expense of the [Indemnity Defendants], to
> complete the contract or cause the same to be
> completed. . . .

Indemnity Agreement, ¶ 4.

Sitarik argues that since the assignment was given as
collateral security, North American received only a qualified

interest "commensurate with the debt or liability secured." (Sitarik Brief at 4, *quoting* Seip v. Laubach, 4 A.2d 149, 151 (Pa. 1939).) Since North American's right to enforce the assigned interests is subject to Sitarik's default, which it has denied, Sitarik retains the right to prosecute claims against the Authority under the Contracts until such time as the question of whether Sitarik did or did not default on its performance is resolved. (Sitarik Brief at 3-4.)

2. *Applicable law:* Under common law principles recognized by the Pennsylvania Supreme Court, "[a]n assignment is a transfer of property or a right from one person to another; unless qualified, it extinguishes the assignor's right to performance by the obligor and transfers that right to the assignee." Legal Capital, LLC v. Medical Prof'l Liab. Catastrophe Loss Fund, 750 A.2d 299, 302 (Pa. 2000). "Ultimately, an assignee stands in the shoes of the assignor." Crawford Cent. Sch. Dist. v. Commonwealth, 888 A.2d 616, 620 (Pa. 2005) ("Crawford"); *see also* Smith v. Cumberland Group, Ltd., 687 A.2d 1167, 1172 (Pa. Super. Ct. 1997) ("Where an assignment is effective, the assignee stands in the shoes of the assignor and assumes all of his rights," including the "benefits and remedies the assignor once possessed.") Simultaneously, "the assignor's right to performance by the obligor is extinguished and the assignee acquires a similar right to such

41

performance." Wilcox v. Regester, 207 A.2d 817, 820 (Pa. 1965.) This makes the assignee "the one who, by the substantive law of the state, has the duty or right sought to be enforced" and, as such, the real party in interest. Am. Soc'y for Testing & Materials v. Corrpro Cos., 292 F. Supp.2d 713, 718 (E.D. Pa. 2003); Wilcox, id. ("the assignee is usually the real party in interest and an action on the assignment must be prosecuted in his name.") This requirement is reflected in the Federal Rules of Civil Procedure which provide that "[e]very action shall be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a).

"[A]n assignment will ordinarily be construed in accordance with the rules governing contract interpretation and the circumstances surrounding the execution of the assignment document." Crawford, 888 A.2d at 623. As summarized by the Pennsylvania Supreme Court,

> [t]he fundamental rule in interpreting a contract is to ascertain and give effect to the intent of the contracting parties. The intent of the parties to a written agreement is embodied in the writing itself. Courts do not assume a contract's language was chosen carelessly, nor do they assume the parties were ignorant of the meaning of the language employed. When contractual language is clear and unequivocal, its meaning must be determined by its contents alone. [A court] may not modify the plain meaning of the contract under the guise of interpretation.

Crawford, id. (internal quotations and citations omitted.)

3.  *Discussion and conclusion:*  As we read Paragraphs
4 and 5 of the Indemnity Agreement, the plain meaning of
Paragraph 5 is that Sitarik and the other Indemnity Defendants
intended to assign to North American all of their rights under
the Contracts, including their right to any payments due
thereunder from the Authority. The assignment would be effective
as of the date of each performance or other bond issued by North
American on behalf of the Indemnity Defendants, which in this
case was July 13, 2006.  (Complaint, Exh. I.)  However, for
North American to step entirely into the Indemnity Defendants'
shoes, i.e., taking on their rights and obligations, Sitarik or
another Indemnity Defendant would have to either (1) default in
the performance of the Contracts, (2) breach the Indemnity
Agreement or any bond issued in connection therewith, or (3)
fail to diligently perform the work required by the Contracts.
In other words, the event triggering both North American's
obligations and its rights – including the right to sums due
under the Contracts -- was the occurrence of one of those three
events.  We agree with Sitarik's interpretation of Paragraphs 4
and 5 of the Indemnity Agreement up to this point.

Where we part ways with Sitarik is its argument that
because it has denied that it was ever in default, the
assignment did not become effective.  If this were the intent of
the parties, the Indemnity Defendants could defeat any operation

43

of the assignment provisions simply by denying they had defaulted on the Contracts, breached the Indemnity Agreement, or failed to diligently perform the work required.  The reference to "default," therefore, must refer to a *declaration of default* by the government agency, just as the reference to a "failure" to diligently perform the work required under the contracts must logically refer to a claim by the contracting entity that this had occurred.  The interpretation proposed by Sitarik would mean that the assignment to North American would not be effective unless or until the question of the claim of default had been resolved, for example, by agreement between the Authority and the Indemnity Defendants or through litigation.  We do not believe that, logically, the parties could have intended this result.

This interpretation of the assignment provision of the Indemnity Agreement is also consistent with the language of the three performance bonds for the Project.  (Complaint, Exh. I.) The Bonds provided that North American would act as surety for a fixed amount for each of the three Contracts with the condition that if Sitarik "promptly and faithfully perform[ed]" its obligations under the Contracts, the Bonds would be "null and void."  The Bonds further provided that if Sitarik "shall be, and declared by [the Authority] to be in default" under the Contracts, North American "may promptly remedy the default or

shall promptly" complete the Contracts or arrange for another contractor to complete them. In other words, Sitarik, North American and the Authority (as obligee of the Bonds) all expected North American to take over and complete the Contracts when Sitarik was declared to be in default, not when the question of whether default had occurred was finally resolved.

According to the Authority, it declared Sitarik in default not later than June 19, 2008. This act, by virtue of Paragraphs 4 and 5 of the Indemnity Agreement, caused the assignment to become effective. North American thus stepped into the shoes of the Indemnity Defendants for all purposes, and acquired Sitarik's right to sue for payment of the contract balances and/or retainage, a right it exercised in its Counterclaim against the Authority for breach of contract. Thus, we conclude Sitarik has no standing to pursue this action against the Authority and will dismiss its claims in their entirety.

An appropriate Order follows.

December ____15____, 2011

_____
William L. Standish
United States District Judge